## THE JOHN GREGORY.

### BRADLEY TRANSP. CO. et al. v. CREECH et al.

(Circuit Court of Appeals, Sixth Circuit. July 6, 1896.)

#### No. 378.

**COLLISION—TUGS RACING FOR TOW.**

The tug G., whose master had received a dispatch engaging her to tow a schooner into the harbor of Cleveland, Ohio, collided with and sunk the tug F., which engaged in a race with her for the tow, the F.'s master being ignorant of the G.'s previous employment. *Held*, on conflicting evidence (there being two disinterested witnesses in favor of the G.), and considering the existence of a motive on the part of the F., which did not exist in the case of the G., that the F. willfully attempted to crowd the G. off her course, and was, therefore, solely in fault.

Appeal from the District Court of the United States, for the Eastern Division of the Northern District of Ohio.

Harvey D. Goulder, for appellants.

John G. White, for appellees.

Before TAFT and LURTON, Circuit Judges, and SAGE, District Judge.

LURTON, Circuit Judge. A collision occurred in September, 1888, between two tugs, off the port of Cleveland, Ohio, in which the tug Forrest City, belonging to appellants, was sunk, and became a total loss. The colliding tug was the Gregory, and was owned by appellees. The district court, on all the evidence, dismissed the libel of appellants. From this decree the owners of the Forrest City have appealed.

These tugs were rivals in business, and the collision occurred in a race between them to secure the job of towing the schooner Constitution, which was approaching the port of Cleveland from what is known as the "Pelee Passage," between Pelee island and Point Pelee on the Canadian shore. The story, as testified to by the master of the Forrest City, is substantially this: The Forrest City went out from the harbor of Cleveland between 10 and 12 o'clock the night before the morning of the collision, and lay during the night at a point from 7 to 10 miles to the north and west of the Cleveland pier, and about W. N. W. from the pier, and in about the line of vessels approaching Cleveland from Point Pelee. When he first saw the Constitution, the latter was W. N. W. about 10 miles from the Forrest City, and coming towards Cleveland. The Forrest City was at once started towards her with the object of securing her as a tow. Shortly after she was started, her master says that he observed the Gregory northward and eastward of his own position, and distant about seven or eight miles. He thinks that at that moment the Forrest City was a little nearer the approaching schooner than the Gregory. He says that the Gregory was then heading more towards the Forrest City than she was for the schooner, and that she continued on that course "until she lapped right under our stern." He distinctly and positively testifies that his own course was pointing directly for the schooner, and that up to the time that the Gregory lapped under the stern of the Forrest City he did not alter his course a particle. He proceeds by saying that "the Gregory came right close under our stern,—within 50 feet, I should think,—and lapped alongside of us on our port side." He further says, when asked how the Gregory got on his port side, that she did so "by running under our stern; our suction, I suppose, drew him up." "The Gregory was a little smarter boat than we were, and he was catching us a little bit." The tugs being thus abreast, they continued to run side by side for a distance of four or five miles, both steering directly for the Constitution, the tugs being so close as "to rub together." The master of the Forrest City then says that after this side by side position had continued for a time he endeavored to separate, as his boat had been newly painted, and he did not wish her to be marked up by rubbing, and for this purpose gave his engineer a signal to stop, and then to back, and that, after he gave these signals, like signals were at once given on the Gregory, and that so soon as the Gregory gave the back signals he gave a signal to stop. "That," says he, "brought us back

with the pilot-house doors about abreast of each other. Then I gave a signal to go ahead, and he gave a signal to go ahead, and we went along. As soon as I started, he started. He put his wheel to starboard, and I put my wheel to port. We both went off in that direction, and got away from one another. He went ahead in this direction [indicating], crossed over here, and rounded to the schooner. The suction of his vessel drew the bow of my boat underneath his stern, and his wheel struck the bluff of my bow. I cannot say how he had his wheel at that time." The wheel of the Gregory inflicted such injury to the bow of the Forrest City in the maneuver described by the master of the latter as that in a short time she was discovered to be filling. Three of the crew of the Forrest City substantially confirm the story of the collision as detailed by her master, Capt. Dwyer.

According to the usual course of such controversies, a very different account of the matter is given by those upon the deck of the other tug. That account, as detailed by Capt. Moffett of the Gregory, is substantially this: The owners of the Gregory while that tug was at the pier at Cleveland received a telegram from the owners of the Constitution notifying them that the schooner had passed Detroit bound for Cleveland. The Gregory was at once started, and steered straight off from the piers about N. W. by west about four miles, when the sails of the schooner loomed up, whereupon the course of the Gregory was altered so as to steer straight for her bow. The Gregory's master says he first saw the Forrest City about a mile or one mile and a half from Rocky river, and about two miles from the shore, and distant five or six miles from the Gregory. This was after the Gregory's course had been changed so as to steer for the Constitution. He says the Forrest City was then lying still, and so continued "until we got pretty well up to her. Then she started right off between us and the schooner, cutting across my bow and the schooner's bow also. He was heading, it looked to me, about half between us and the vessel." Capt. Moffett's examination then proceeds as follows:

"Q. Did you near each other? A. Yes, sir. He was running in this direction, and I was running this way [indicating]. Q. When you got near, were there any signals interchanged? A. Bells? Q. Yes, bells or whistles? A. Well, I blew a blast of my whistle. When I blew it the whistle rope broke. Q. Where was his boat at that time? A. About 400 or 500 feet from me on the port bow. Q. Heading how? A. On the port bow. Q. Did you get any answer? A. No, sir. Q. Did the Forrest City do anything in the way of checking? A. No, sir; she kept right on going. Q. Then what did you do? A. I seen we were going to hit them, and I checked my boat down to let them cross my bow. Q. How close to your bows? A. I could almost jump on her. Q. Then what occurred? A. Well, I was steering right along my course. He put his wheel starboard, and came up alongside of me. Q. What do you mean by alongside? Close alongside? A. Yes, sir; right up; got in our suction, and sheered off towards me. I couldn't say how he put his wheel, but anyway she came up alongside of me. Q. Show us how she crossed your bows. A. [Indicating.] The boats were going like that. Q. And you have said that while on the course I am marking, when she crossed your bow she crossed how close? A. I checked my boat down, and she just got across my bow. If I hadn't checked down we would have hit him. Q. Then you say he came alongside? A. Yes, sir. Q. By the Court: Show me that movement. A. [Indicating.] When he was in this position, I checked my boat down. If I hadn't,

we would probably have hit him. As soon as he got across my bow, I was steering a straight course for the schooner. Whether he got in my suction, or whether he put his wheel to starboard, I couldn't say. Anyway he came up alongside of us. Q. You run alongside for how long? A. A mile and a half. Q. What occurred while you were running alongside of each other? A. We were running along there for about a mile and a half chafing each other all up. I said to myself: 'I got a dispatch from Capt. Kerr. If he gets there first he won't get the toll.' So I stopped. Q. You stopped, captain? A. Stopped. Q. What then? A. When I stopped, he stopped, and backed his boat up. Q. Then what? A. I started ahead again. Q. Then what did he do? A. Well, I got almost by him—got away up here [indicating]. I was going ahead with starboard wheel in order to get away, and the boats got about in that position [indicating]. Q. They separated in the manner that you have indicated? A. Yes, sir; this boat might have been a little bit further ahead. Q. Then what occurred? A. Well, when I got up there in that position [indicating], I started ahead, and he started ahead. His boat came in here [indicating] so as to hit us on the starboard quarter here like this.' Q. Came together in the manner indicated by the third position in which you have placed the vessels? A. Yes, sir. Q. What was the effect of that? A. Well, it knocked my wheel out of my hand 'when he hit it. My steward was standing right abreast of the pilot-house door, and I told him to come and help me put the wheel over. Q. Well, what occurred? A. I put my wheel hard a-starboard and I held it there. Q. What was the effect on the boats? A. Well, both boats were rolled up. I was rolled to port and he to starboard. Q. How much was you rolled over? A. So the water was way up on top of the decks, going over the top of the scuppers into the firehold. Q. What did you do then? A. This man that was helping me hold it lost his hold, and fell out of the pilot-house. When he let go it jerked it from me, and I let go. Q. What was the effect? A. When I let go the boat let up. The Forrest City, as soon as I let go, he shoved me off like that [indicating] round to the northward, and he went toward shore. Q. Turned you round so you had it more to northward and he to land? A. Yes, sir. Q. Did the striking leave any marks on your boat? A. Yes, sir; it broke our fender streak. A. I felt the wheel hit something, but I couldn't say what it was. Q. When you parted in the manner you have described, what occurred next? A. When we parted? Q. Yes. A. Well, I should judge that his wheel was like that [indicating], and that is how I got away from him. I stopped my boat when I let go the wheel. As soon as I got clear, I rang a bell to go ahead again. Q. By the Court: After he struck you on the starboard, did it cross back of you? A. Yes, sir. He got off in that position [indicating] from me. Then the vessel was off in here. I put my wheel round to starboard. He didn't turn his clear around. When I got back that way [indicating], he was a little ahead. I rang a signal to the engineer, and he let her wide open. We had a mile and a half to run to the boat. We put a line on her, and Captain Kerr said to me, 'Come aboard.' I said, 'Come on, Fell, let's go aboard the vessel,' and him and I both went aboard the vessel."

The important points of this evidence are confirmed by three of the crew of the Gregory and by two disinterested witnesses on board her as guests of her master. The conflict upon matters of import between the witnesses for the contending tugs relates chiefly to the course steered by them, respectively, which led to their running side by side in this most dangerous and reckless race for the approaching schooner, and also to the efforts made by each to separate and draw out of the contest. The master of each tug testifies that when the approaching schooner was sighted the course of his tug was laid directly for the schooner, and that course maintained. So the master of each testifies that, after this race had continued for a time, he endeavored more than once to pull off, and checked and backed for that purpose, but was prevented by like movements of the other tug, which prevented a separation, and led to their going

forward abreast until the final maneuver, which resulted in the bow of the Forrest City being cut by the wheel of the Gregory. Which story is this court to credit? The conflict is irreconcilable. These tugs started for the Constitution from points well off to the right and left of the course of the schooner prolonged. Each claims to have steered for the schooner, and to have adhered to that course. It is clear that if this was true that their lines would not have converged until very close to the schooner, yet the fact is, their courses crossed several miles before reaching the tow. Who is at fault for this? If this fact can be ascertained, it will go far to settle the responsibility for the reckless race which ensued. The Gregory had no motive leading her to cross the course of the Forrest City. The tow was secured by the dispatch from the owners of the schooner which the master of the Gregory had in his pocket when he started from the pier. The usual rule that the tug first reaching an approaching vessel should have the tow did not apply to the Gregory, for her master had every reason for believing that, being in sight, he would get the tow, though the Forrest City first reached her. The master of the Forrest City, on the other hand, knowing nothing of the telegram to the Gregory, had reason to suppose if he could first get to the Constitution he would secure the job of towing her, and thus had a motive to engage in such tactics as would crowd the Gregory off her course. The Gregory was at the time the faster boat, probably due to the fact that when the Forrest City started she did not have a full head of steam. If, therefore, she could get alongside of the Gregory, and within the influence of her suction, the slower tug would take the speed of the faster, through the force of the suction in the leading tug. It was also desirable to approach the Constitution on the starboard or landward side. The position from which the Gregory started in relation to the schooner and the Forrest City, gave her this advantage. It was, therefore, advantageous for the Forrest City to get on the lake or northward side of the Gregory. These considerations combine to give the Forrest City a motive for departing from her course, and crossing the course of the Gregory, which she might do without increasing the distance to the schooner. Finding the master of the Forrest City with a motive for departing from a direct course to the schooner which the master of the Gregory did not have, we are justified, on a balanced state of evidence, in settling a question of credibility or doubtful fact by throwing into the scale the motive which might lead one to do that which his antagonist had no known object in doing. These circumstances find some support in the fact that two of the witnesses from the deck of the Gregory were disinterested. The court is not inattentive to the fact that all on board a vessel are liable to participate in the feeling and opinions entertained by those composing her company where the contest is with another and colliding vessel. Yet the fact remains that these two witnesses were comparatively disinterested, and therefore more likely to see clearly and speak honestly than witnesses who were actors in the drama. But another reason exists for concluding that the Forrest City was the aggressor, and that she departed from her proper course and

willfully crossed the bow of the Gregory, in the fact that the district judge, who saw and heard the witnesses, reached this conclusion. That court not only had the advantage of seeing and hearing the witnesses, but the advantage arising from diagrams indicating the course and position of these tugs at different times which were made and used by the witnesses below. Such evidence is of peculiar importance in understanding the evidence of witnesses to such a transaction as that under consideration, and has been omitted from this record. These considerations lead us to assent to the conclusion that the Forrest City deliberately and willfully departed from her course, and, though signaled by the Gregory to keep her course, so altered it as to cross the bow of the Gregory in such dangerous proximity as, but for the checking of the Gregory, would have resulted in a collision at that moment. Up to this point we must conclude that the Forrest City was alone guilty of a fault in navigation. That for a time the Gregory willfully held a place abreast or about abreast of the Forrest City, and so close that for one or more miles the tugs were rubbing against each other, we have no doubt. But the same considerations which led us to accept the evidence of the master of the Gregory upon the first and most important point of conflict leads us to believe him when he says he made more than one effort to separate, and was hindered by the dropping back and simultaneous stopping, backing, and going ahead of the Forrest City. We can well see how the master of the Gregory might refuse for a time to be crowded off his course, and finally conclude that, as he would get the schooner though the Forrest City should reach her first, he would desist from so dangerous and reckless a course of conduct, and withdraw from the race. Being the aggressor throughout, the Forrest City was rightly adjudged to bear her own loss.

The final catastrophe was the direct result of the effort of the Forrest City to crowd the Gregory over and out of her course. The latter was listed over so much as to alarm her master, and induce him to let his wheel go, so as to head away from the Forrest City, and thus separate. Either the steering of the Forrest City was such when this was done, or the effect of the Gregory's suction was such, that the bow of the Forrest City hit the Gregory's starboard quarter a blow which broke the fender streak of the latter and placed the bluff of her bow in such position as to be struck by the Gregory's wheel, inflicting the injury which caused her loss. The fault of the Forrest City in departing from her course, and in aggressively endeavoring to crowd the Gregory off her course, justly merits that she should bear her own loss. The judgment of the district court will be affirmed.